## TEXAS GLASS & PAINT CO. v. FIDELITY & DEPOSIT CO. OF MARYLAND.
### (No. 307–3627.)

(Commission of Appeals of Texas, Section B. Oct. 11, 1922.)

**1. Insurance ⚖⇒539(3)—Effect of statute on stipulation for immediate written notice of accident stated.**

Under liability indemnity policy requiring immediate written notice of accident, but also providing, by clause marked (m), that if the limit of time for notice of accident therein contained were at variance with any specific statutory provision, the statute should supersede any contrary contract condition, *held* that, even if Rev. St. art. 5714, providing that contract stipulation requiring notice of "any claim for damages" should be void, unless reasonable and for a period of at least 90 days, be applicable to a stipulation for immediate notice of accident, yet such stipulation would be modified by the clause marked (m), and, the two clauses being read together, the provision for immediate written notice would be "superseded" by article 5714, so as to require reasonable delay, if not less than 90 days; hence a delay of over 21 months was unreasonable as a matter of law.

**2. Insurance ⚖⇒535—Injuries to night watchman held of sufficient seriousness to require report to insurer.**

Where a night watchman was found at the bottom of the elevator shaft in plaintiff's building in a dazed condition, with gashes in his head and had to be taken to a hospital, and the physician who attended him reported that a hypodermic had to be administered, and that the seriousness of the case could not be determined until the medicine had some effect, the injuries were of sufficient seriousness to require a report to the insurer.

**3. Insurance ⚖⇒665(3)—Evidence held to show that insured failed to perform its full duty in investigating case.**

In an action against an insurance company to recover damages paid to a night watchman, evidence *held* to show that the insured failed in its full duty in investigating the case in order to ascertain the manner in which accident occurred.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by the Texas Glass & Paint Company against the Fidelity & Deposit Company of Maryland. A judgment for defendant was affirmed by the Court of Civil Appeals (226 S. W. 811), and plaintiff brings error. Affirmed.

Hugh L. Umphres and Crane & Crane, all of Dallas, for plaintiff in error.

Albert B. Hall, of Dallas, for defendant in error.

McCLENDON, P. J. Plaintiff below, Texas Glass & Paint Company, was the owner of a manufacturing plant in Dallas, Tex., consisting in part of a building four stories high with basement. In October, 1912, while this building was undergoing some repairs the elevator was removed, and a stairway in the elevator shaft was narrowed. At that time Smith's Detective Agency was furnishing plaintiff with a night watchman for this building. Under this arrangement one Reese, an employé of the detective agency, was on duty during the night of October 22–23, 1912. It was the duty of Reese to make regular rounds through the building and report to the agency by means of an electrical device so arranged that he could at stated hours during the night report to the agency from the several portions of the building. The only mode of passing from one floor of the building to another was by the stairway referred to. On the morning of October 23, 1912, Reese was found at the bottom of the elevator shaft in the basement in a somewhat dazed condition. He was taken to a hospital and treated. About six months later he was put back to work in plaintiff's building as night watchman under the detective agency, which position he filled for about a year, when he was discharged by the agency. Shortly after this, about June, 1914, Reese brought suit against plaintiff company for personal injuries, alleging that he received his injuries by striking his head against a piece of plank projecting over the stairway on the fourth floor, which caused him to fall into the elevator shaft, a distance of about 50 feet. He claimed to have received injuries about the head and to have broken his collar bone. The case was tried to a jury, and Reese was given judgment against plaintiff for $1,000 and costs. This judgment was affirmed by the Court of Civil Appeals (187 S. W. 721), and writ of error refused by the Supreme Court.

The present suit was brought by plaintiff company against Fidelity & Deposit Company of Maryland to recover from the latter the amount of this judgment, costs, attorney's fees, and expenses incident to the litigation upon a policy of insurance whereby defendant agreed to indemnify plaintiff—

"against loss from the liability imposed by law upon the assured for damages on account of bodily injuries or death caused by any accident, and suffered by any person or persons not employed by the assured while within the" premises named.

"(2) To defend in the name and on behalf of the assured any suit brought against the assured to enforce a claim, whether groundless or not, for damages on account of bodily injuries or death suffered or alleged to have been suffered by any person or persons not employed by the assured at the places designated in the preceding paragraph during the operation of the trade or business described in the said schedule, and resulting from an accident occurring during the period this policy is in force."

The policy also contained the following clauses, compliance with which was made a condition precedent to plaintiff's right of action:

"(b) Upon the occurrence of an accident, the assured shall give immediate written notice thereof, with the fullest information obtainable at the time, to the company at its home office in Baltimore, Md., or to its authorized representative. If a claim is made on account of such accident, the assured shall give like notice thereof with full particulars. If thereafter any suit is brought to enforce such a claim, the assured shall immediately forward to the company at its home office every summons or other process as soon as the same shall have been served on him.

"(m) If the limit of time for notice of accident or for any legal proceeding herein contained is at variance with any specific statutory provision in relation thereto, and in force in the state in which this policy is issued, such specific statutory provision shall supersede any condition in this contract inconsistent therewith."

The defendant pleaded in bar of recovery failure to give notice of the accident as required in policy stipulations (b) and (m), just quoted. The trial was to the court, and judgment was rendered in favor of defendant. This judgment was affirmed by the Court of Civil Appeals (226 S. W. 811).

The defendant had no notice of the accident until July 1, 1914, shortly after the Reese suit was filed, and over 21 months after the accident happened; and the only questions presented for decision are embodied in two contentions of the plaintiff, under each of which it seeks to avoid the effect of the policy stipulation for immediate notice of the accident. These contentions are:

First. That the stipulation is void under article 5714, Revised Statutes, in that it requires notice of less than 90 days.

Second. That the uncontradicted evidence shows that plaintiff's only information regarding the accident up to the time the suit was filed was that Reese had been overcome by heat or illness; and therefore the occurrence did not come within the policy stipulation requiring report of an accident.

[1] The case of Insurance Co. v. Scott (Tex. Civ. App.) 218 S. W. 53 (writ of error refused) decides the first of these contentions adversely to plaintiff. That suit was upon the same character of policy here involved, which contained, in substantially the same language, the above-quoted clauses (b) and (m). No notice was given the insurer until 17 months after the accident. The Court of Civil Appeals reversed a judgment in favor of the assured and rendered judgment for the insurer, upon the holding that, even if article 5714 applies to a stipulation for "immediate notice of an accident," that stipulation must be held to be modified by clause (m), and that, when the two clauses are read together, the provision for "immediate notice" is "superseded" by article 5714 so as to require reasonable notice of not less than 90 days, and that a delay of 17 months was unreasonable as a matter of law. While the decision is rested upon this holding, the Court of Civil Appeals expressed grave

doubt whether article 5714 is applicable to a stipulation for "immediate notice of an accident." It is not necessary for us to discuss this latter question or the holding upon which the decision is rested, since we consider the refusal of the application for writ of error as an adjudication by the Supreme Court denying plaintiff's first contention, above.

[2] Passing to plaintiff's second contention: While the language of clause (b) requiring immediate notice of "an accident" is absolute, and, if construed with technical literalness, is broad enough to require immediate report of every occurrence which might in any sense come within the general meaning of "an accident," still it would be manifestly unreasonable to require notice until the insured had been apprised of the occurrence, unless failure to be so apprised was due to the laches of assured; and similarly it would seem unreasonable to require report of such occurrences as would appear to have no reasonable relation to the subject-matter of the policy, or not at all likely to result in any claim or liability.

The following quotation from Christatos v. Casualty Co., 95 Misc. Rep. 534, 159 N. Y. Supp. 700, is a fair statement of the general holding upon the first of these propositions:

"The condition of the policy is to be interpreted as meaning that the insured shall give immediate notice after the insured has become apprised of the accident, or should have become so apprised, had he exercised reasonable diligence. There is therefore cast upon him the duty of so regulating his business that he may be apprised with reasonable certainty of any accident that may occur in its conduct. If, despite the exercise of reasonable care, the insured fails to acquire the information till after a lapse of time, but in its acquisition gives prompt notice to the insurance company, he complies with the obligation of the policy."

For other authorities upon this question, see Wolverton v. Fidelity & Casualty Co., 190 N. Y. 41, 82 N. E. 745, 16 L. R. A. (N. S.) 400; Chapin v. Accident Co., 96 Neb. 213, 147 N. W. 465, 52 L. R. A. (N. S.) 227; Motor Co. v. Fidelity Co., 190 Mich. 74, 155 N. W. 729.

The second proposition has been applied to those occurrences which at the time seem in their consequences to be so slight as to preclude a reasonable probability that they will result in claim or liability. The holding in such cases is embraced in the following quotation from Chapin v. Ocean Accident & Guaranty Co., 96 Neb. 213, 147 N. W. 465, 52 L. R. A. (N. S.) 227, which appears to be the leading case upon that subject:

"At the time and shortly after the collision Lewis stated that he had received no injury. If he had received no injury, or if the accident would not in an ordinary mind induce a reasonable belief that it might result in bodily injury, there was no obligation to notify the insurance company."

This holding was followed in Melcher v. Ocean Accident & Guarantee Co., 226 N. Y. 51, 123 N. E. 81, and Tobacco Co. v. Fidelity Co., 226 N. Y. 343, 123 N. E. 755, 13 A. L. R. 132.

In the Melcher Case it was held that:

"It is not every trivial mishap or occurrence that the assured under such a policy of liability insurance must regard as an accident of which notice should be given immediately to the insurance company, even though it may prove afterwards to result in serious injury."

It would seem to be a fair deduction from these holdings that, when the insured has complied with its full duty to acquaint itself with all the facts surrounding an accident, and it appears from such investigation that the occurrence was of such a nature as that it could not reasonably be expected to result in any claim or liability, there is no duty to report it. The policy does not insure against all accidents, but only those which result in bodily injury, as distinguished from injury to property; and such bodily injury must be sustained by one who is not an employee of insured. It seems clear that an injury arising solely from illness or physical collapse would not come within the term "accident," as used in the policy.

On the other hand, it is equally clear that determination of the question whether an occurrence comes within the terms of the policy as being an accident required to be reported should not be left solely to the judgment or discretion of the assured. Consequently it has been held that the insured is not relieved from its duty to report an accident merely because its attorney made a full investigation and reached the conclusion that it was too trivial to report. In such case the assured acts at its peril. Oakland Motor Car Co. v. American Fidelity Co., above. A clear application of the rule under consideration and its limitations is given in the following quotation from the Tobacco Company Case above:

"In the Melcher Case the plaintiff heard that an outside workman employed in repairing his building had been struck by an elevator. He immediately investigated the matter. He saw the workman in question and was told by him while he was at work in the shaft the car had struck him and raised him about a foot. He said that he was not at all hurt, and as a matter of fact he continued at work for the rest of the day, leaving in the evening when the work was completed. The insured never heard anything more of the occurrence and had no reason to suppose that there would be any serious results until some 10 weeks later, when the information reached him that the workman's spine had been seriously injured. He thereupon immediately notified the insurance company. We held that a recovery was permissible. The circumstances in the present case require a different result. A boy struck the machine and was knocked down. True, the driver, who represented the plaintiff, believed he was only slightly hurt, for he walked away, and in his opinion the accident did not amount to much. But no investigation was made. There was no assurance by the person struck that he was uninjured. There was no opportunity by later observations of determining that he was not in fact injured. The plaintiff relied wholly upon the driver's opinion, an opinion which, as subsequent events showed, was a mistaken one.

"The ruling in the Melcher Case is not to be extended. Under the peculiar circumstances there disclosed, and in view of the full investigation made, it might fairly be said that a reasonable man was justified in believing the occurrence so trivial that no report was required. But where, as here, a boy is knocked down in the street, and at least slightly injured, the insured may not, without any investigation whatever, rely solely upon his own opinion or upon the opinion of his driver that because he went away the injury was too trivial to require attention."

In the Melcher Case there were some disputed issues of fact, and the whole question whether under all the circumstances the duty rested upon the assured to report the accident was referred to a jury.

The instant case was tried before the court without a jury. There are no findings of fact or conclusions of law, and therefore the evidence must be viewed most strongly in support of the trial court's judgment. Unless we can hold, therefore, that the evidence admits of but one reasonable conclusion, namely, that the insured performed its full duty in investigating the accident, and that the light thus afforded precluded every reasonable hypothesis other than that Reese suffered his injuries as the result of illness or physical collapse, the trial court's judgment ought not to be disturbed.

In order to determine this question a careful perusal of the entire statement of facts is essential. The only testimony on this subject is that of the witness Jackson, who was general manager of the insured in charge of the plant in question, and upon whom, as between himself and his employer, rested the duty of investigation and report to the insurance company. His evidence may be summarized as follows: He heard of the accident the morning after it happened from some of the employees, several of whom he talked to personally. He also talked to Mr. Smith, general manager of the detective agency. One of the employees told him "that Reese had had a physical collapse, and was taken away by the Smith Detective Agency, his employer." Mr. Smith "advised me that in his opinion Mr. Reese had had a physical collapse. He was quite old and had simply collapsed." On the same day he received from Mr. Smith by letter the following report:

"I wish to explain to you the occurrence in connection with the watchman's injuries received while at your plant this morning. I

was at the office at the time, and went out there. It looks to me like a simple case of physical collapse. The man had finished his rounds and had reported over the telephone to our board man at the usual time, and, when we found him and got him to talk, he said he remembered making the round and having a feeling of sickness come over him, and then that was all he did know. He evidently fainted, and in falling struck his head which caused the gashes. He complained of pains in his chest and about his heart. I called a taxicab and sent him home and summoned a physician, who administered hypodermic and said that he could not tell himself just how serious the case was until the medicine had some effect. As I made a personal examination of the conditions and surroundings and talked with the man, I am quite convinced that he became completely exhausted and had an attack of heart weakness, which caused him to lose consciousness and fall, before he realized that his strength was so far gone."

Jackson testified further:

"I also talked to Mr. George Smith, the detective on the morning after the accident. He told me that in his opinion that the night watchman had had a collapse, and I think he told me about taking him home, although I am not positive about the last. I think Mr. Smith had gone out to see Mr. Reese before I talked to him that morning."

"With reference to the matter of relying upon Mr. Smith to keep us informed of the condition of Mr. Reese, we simply relied upon Mr. Smith to give us accurate and correct information. He advised us that the watchman had had a physical collapse. If Mr. Smith had found that the man had been injured, he would have so notified us. We did not understand that we owed Mr. Reese anything, even if he was hurt; he was not our employee. We assumed that as long as it was just a physical collapse that it was not necessary to make a report of a man who had fainted in our store, and, if Smith had found that the man was injured, he would have told us. In other words, Smith was employing the man, and we relied upon him to give us any information we might desire from him."

"The following morning, or the morning after he was taken out of the building, I talked to the retail clerk who talked to him, and I talked to one of the boys in the office, and I talked to Mr. Smith, and Mr. Smith told me that he investigated the matter thoroughly, and that the man just had a collapse. He said the building was too hot; he was an old man, rather feeble; and he said that the building was closed up and he had overexerted himself, and he had just had a collapse, and that was all there was to it. All the information I had was what I have repeated; that is, that the old man was found lying on a bench when the store was opened by some of the employees of the plaintiff. If I had been advised that the man had been injured, the first thing I would have done would be to send in an accident report, because it has always been my custom to see that some responsible person is in charge of those reports. It always has my personal supervision. That is the first thought we would have had if he had been injured. I had no information indicating that he had sustained an injury, other than a physical collapse, and I did not understand that he had sustained some injury on account of the fault or negligence of the company, so that we might be subject to a suit or a claim for damages. He [Reese] was not at work for a short term, possibly six weeks or two months, and then he came back and worked for us nearly two years before this suit was brought. I do not mean that he worked for the Texas Glass & Paint Company, but he was the night watchman of our premises, but he was paid by Smith Detective Agency. I saw him there frequently During the time he was there he had the privilege of occupying any part of our office when he was not on his rounds. I talked to him frequently at night, and he had ample opportunity to say something about his injury, but he never mentioned it to me."

On June 20, 1914, just after the Reese suit had been filed, Jackson wrote the following letter to the president of his company:

"About two years ago we had a night watchman in the building by the name of Reese. We contracted with the Smith's Detective Agency to look after our warehouse at night, paying them a fixed sum for this service, they employing and discharging the man.

"I remember this watchman being found in the building one morning about 7 o'clock in rather a dazed condition. At the time he stated that he fell in the elevator shaft. It was the general impression, however, that he was drunk, and that he had some one in the building with him that night. The Smith's Detective Agency furnished us a new watchman, and we never heard anything from him until a few days ago, when we received a notice that this man Reese had brought suit against us for $13,000, claiming he fell down the elevator shaft, broke his collar bone, etc., and was permanently disabled.

"We have turned this matter over to Messrs. Crane & Crane, and they are preparing an answer to the charge. I shall notify you in case there are any further developments."

Concerning this letter Jackson testified:

"The information in my letter to our president in my letter of June 20, 1914, beyond question, was given to me at the time the letter was written. It was not my intention to convey the idea that I had the notice at the time of the accident. It was given to me about the time the letter was written."

"Referring to my letter of June 20, 1914, I now remember the things stated in that letter that he (Reese) was 'found in rather a dazed condition.' I do not mean to say that I had that information at the time the accident occurred. When I made my report to the president, I went into details and reported to him what had been stated to me. There is nothing in the letter to indicate when I received the information.' "

There can be no question but that the injuries received by Reese were of sufficient seriousness to require their report. He was found in a dazed condition with gashes cut in his head. He had to be taken to a hos-

pital, and a physician summoned, who reported that he had to administer a hypodermic, and "could not tell himself just how serious the case was until the medicine had some effect." The only issue for decision resolves itself into two questions:

[3] First. Did the plaintiff, as a matter of law, perform its full duty in investigating the case, in order to ascertain the manner in which the accident occurred?

Second. Did the result of such investigation relieve it as a matter of law from making a report?

We have reached the conclusion that both of these questions should be answered in the negative.

The conclusion that Reese suffered a physical collapse was based solely upon a survey of the physical facts and a statement made by Reese to Smith. The physical facts were that Reese was found lying on a bench at the foot of the elevator shaft in a dazed condition and with gashes cut in his head. So far as the record shows, these facts were not inconsistent with the theory upon which Reese recovered. The statement of Reese as to how the accident happened was taken at the time he was found in a dazed condition, and evidently not in a mental condition to give a reliable account of the occurrence. In the language of Smith's letter:

"When we found him and got him to talk, he said he remembered making the round and having a feeling of sickness come over him, and then that was all he did know."

The record is silent as to any other effort to get a statement from Reese. The attending physician, who naturally would get a full history of the case from the patient after he had recovered from the effects of the hypodermic, was not further interrogated, so far as the evidence discloses. Reese returned to the plant about six weeks later and worked there for a number of months, during which time Jackson talked to him frequently. If he ever asked Reese anything about the accident, that fact does not appear from his testimony. The fact that Reese did not volunteer such information did not necessarily relieve Jackson of the duty of an effort on his part to obtain it. The letter of Jackson to the president of his company states that "at the time he [Reese] stated that he fell in the elevator shaft." The only explanation which Jackson makes of this statement is that he got it at the time he wrote the letter and did not have the information previously. He does not say to whom the statement was made nor does he attempt to explain why he did not acquire that information at the time, further than, as stated previously in his testimony, that he relied on the detective agency to keep him informed. The judgment in the Reese case conclusively establishes the fact, as far as plaintiff is concerned, that Reese sustained his injuries in the manner alleged in his petition. Aside from the statement he made when he was first found to the effect that all he remembered was "having a feeling of sickness come over him," there is nothing in the record to indicate that Reese ever attempted to induce any one to believe that he was injured otherwise than as he alleged in his suit. We hardly think we would be warranted in holding as a matter of law that plaintiff met its full duty in investigating the facts surrounding the accident. Nor do we think that the evidence precludes the theory that, if inquiry had been made of Reese himself after he had sufficiently recovered from the dazed mental condition produced by his fall, plaintiff would have been apprised of his claim as to the manner in which he was injured.

We conclude that the judgment of the district court and Court of Civil Appeals should be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.